Argued and submitted October 23, 2006, affirmed March 28, 2007

## TIMBERLINE BAPTIST CHURCH,
*Petitioner,*

*v.*

## WASHINGTON COUNTY,
*Respondent.*

Land Use Board of Appeals
2006058; A133320

154 P3d 759

Ross Day argued the cause for petitioner. With him on the brief was Oregonians in Action Legal Center.

Chris Gilmore, Assistant County Counsel, argued the cause for respondent. With him on the brief was Office of Washington County Counsel.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Breithaupt, Judge pro tempore.

BREWER, C. J.

Breithaupt, J. pro tempore, concurring.

Wollheim, P. J., dissenting.

## BREWER, C. J.

Petitioner, Timberline Baptist Church (Timberline), sought approval from Washington County for special uses of property for a church, a day care facility, and a day school. The county granted special use and development review approvals for the church and the day care facility, but denied the requested special use approval for the proposed school. Petitioner appealed to the Land Use Board of Appeals (LUBA), which affirmed the county's decision. Petitioner now seeks judicial review of LUBA's order, asserting that LUBA erred in determining that denial of the special use approval for a weekday parochial school did not impose a "substantial burden" on petitioner's religious exercise in violation of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 USC §§ 2000cc to 2000cc-5 (2000) (set out, in part, below).[1] We conclude that the county's decision did not impose a substantial burden under RLUIPA and therefore affirm.

We take the relevant facts from LUBA's order and the record. Timberline Baptist Church was founded in 2001. At the relevant time, it had 267 members and held weekly services attended by 150 to 200 persons. The majority of the members resided in the City of Sherwood. The church used a converted single-family dwelling within Sherwood for its offices and for small meetings and rented space in the local high school and in other churches for Sunday and midweek services. In 2005, the church began operating a school for the congregation's children in a separate leased facility; the school had 19 students.

---

[1] RLUIPA provides that the substantial burden provision of 42 USC 2000cc(a)(1) applies when:

"the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved."

42 USC 2000cc(a)(2)(C). The parties have not addressed that issue in this case. For the purposes of this opinion, we assume without deciding that the application of the county's decision constituted an individualized assessment as that term is used in 42 USC 2000cc(a)(2)(C).

In 2004, the church purchased the subject property of slightly more than seven acres for $500,000. The property is located in Washington County, outside the urban growth boundary (UGB) of the City of Sherwood. It is zoned AF-5 (Agriculture-Forest, 5-acre minimum lot size), as is land to the east and south. Land to the east is developed with rural residences and agriculture, and land to the west is in farm use in an AF-20 zone. Land to the north includes a dwelling, is in farm use, and is zoned for future development.

The AF-5 zone allows schools, churches, and accessory day care centers as permitted uses, subject to "special use" standards. One of those special use standards is established in Washington County Development Code (CDC) § 430-121.3, which provides that "[s]chools outside an urban growth boundary shall be scaled to serve the rural population." That provision was in effect when the church purchased the property.

The purchased property is developed with a manufactured dwelling and outbuildings. In 2005, petitioner began the process of seeking approval to build a 20,570- square-foot, single-story building that would serve as a combined church sanctuary, day care facility, and school.[2] Petitioner indicated that the school would serve 50 children from kindergarten through grade 12, would have five staff members, would be housed in a large multipurpose room within the proposed church building, and would operate from Monday through Friday, from 8:00 a.m. to 4:00 p.m. County staff recommended approval of special uses of the property for a church and a day care facility. However, relying on evidence that the prospective students of the proposed school would be children of church members and that church members primarily resided within the UGB, and applying a "rebuttable rule of thumb" that, in order for a school to be "scaled to serve the rural population" within the meaning of CDC § 430-121.3, at least 75 percent of its student body must be students residing in rural areas, county staff concluded that the proposed school use did not comply with that ordinance provision.[3] Staff therefore recommended denial of the school use.

---

[2] Petitioner's use of leased facilities for its school operation continued at all pertinent times.

[3] The 75 percent rule of thumb is not an express requirement under any county regulation cited by the parties. The hearings officer's order explained that, "the

After a hearing, the county land use hearings officer agreed that the proposed school failed to meet the criterion in CDC § 430-121.3. The hearings officer also determined that application of that code provision to petitioner did not violate RLUIPA. The hearings officer first concluded that application of the criterion did not impose a "substantial burden" on petitioner's religious practice because petitioner had failed to demonstrate that it had made a "sufficiently diligent effort" to locate suitable property within the UGB, where the school use would be permitted outright. The hearings officer also concluded that petitioner had failed to show that operating the school on a site separate from the church imposed a substantial burden on its religious practice, because evidence in the record showed that the church and the school currently were operating in separate locations. The hearings officer issued a decision approving the application as to the church and the day care facility, subject to conditions of approval, and denying it as to the school.

Petitioner appealed to LUBA, arguing that the county's denial of special use approval for a school violated RLUIPA by reason of imposing a substantial burden on its religious practice and not furthering any compelling interest of the county. Pointing to its evidence in the record with respect to the availability of properties within the UGB at the time that it purchased the property, petitioner argued that the county therefore failed to demonstrate that petitioner did not make a "sufficiently diligent effort" to purchase such property. Petitioner also challenged the "sufficiently diligent effort" standard itself, arguing that it was sufficient that it acted reasonably in searching for suitable properties and arguing, alternatively, that the existence of alternative sites is irrelevant.

Notwithstanding that it continued its operations utilizing leased facilities, petitioner argued that the denial of its application imposed a substantial burden, asserting that the current separation of its church and school facilities was

county hearings officer and Board of Commissioners have construed CDC 430-121.3 to require that at least 75 [percent] of the students attending a school in the rural area must reside in the rural area, in the absence of another basis for complying with that section." In other words, the rule of thumb reflects the county's interpretation of its ordinance. Petitioner does not assert that that interpretation has been applied to it in a discriminatory manner.

intended to be only temporary and that location of the school within the church building was important to the church's religious mission. Finally, relying on *Corp. of Presiding Bishop v. City of West Linn*, 338 Or 453, 111 P3d 1123 (2005), and cases cited therein (discussed below), petitioner argued that those issues were, in effect, "academic" because the county's denial met the test stated in that case: it forced petitioner to choose between forgoing or modifying an expression of its religious belief and obtaining a government benefit.

LUBA affirmed the county's decision. As pertinent to petitioner's arguments under RLUIPA,[4] LUBA first determined that, on the record presented, operation of the proposed school was a religious exercise for the purpose of that statute. LUBA then considered whether application of CDC § 430-121.3 imposed a substantial burden on that exercise. LUBA concluded that evidence of the availability of alternative property that met the conditions was relevant to the question whether the inability to operate the school at the same location as the church constituted a substantial burden.

As LUBA explained, the evidence on that issue consisted, initially, of a list of 16 properties in the Sherwood area that are greater than three acres in size and were on the market in January 2006. The list was generated by a real estate broker who represented petitioner during its acquisition of the subject property in 2004. In a memorandum that accompanied the list, the broker stated that most of the identified properties were already developed with residences, and none of the remaining properties had "ease of access off a main thoroughfare."

In addition, petitioner submitted a list of 28 parcels in the Sherwood area that were sold during the last half of 2004. Petitioner also submitted a list of 29 properties that were on the market in January 2006. For both lists, the broker used a filter of four acres and a $10 million upper price

---

[4] Preliminarily, LUBA noted that, in an earlier proceeding, it had determined that denial of a proposed church school under CDC § 430-121.3 did not violate the Free Exercise Clause of the First Amendment to the United States Constitution. *Cf. Corp. of Presiding Bishop*, 338 Or at 461-64 (explaining that RLUIPA is interpreted to embody jurisprudence under Free Exercise Clause). LUBA also noted, however, that the RLUIPA substantial burden test is fact-specific and is therefore not controlled by LUBA's Free Exercise analyses in other cases.

limit. All but one of the parcels on the first list were located outside the UGB and apparently were rejected for that reason. The remaining listed property bore only the notation "11/05/02 Property Pending Sale." The second list, consisting of properties on the market in January 2006, included notations that rejected each of the 29 properties for various reasons, including "outside the [UGB]," "limited access to the property," "limited exposure of property," "out of price range," and "parcel size too small."

In response, the county submitted a memorandum identifying 16 parcels within the UGB that were located near the subject property that, it asserted, appeared to meet petitioner's size requirements (although the list did not give an acreage count for any of the listed properties). Petitioner responded that, for 12 of the 16 properties, "no market data" was available. According to petitioner, the remaining four properties previously had been sold or listed in the price range of $1.9 million to $2.7 million. Petitioner asserted that those four properties were not acceptable based on access, visibility, or price. Finally, the county identified two additional properties in the area that had been sold in mid-2005 for $125,000 to $160,000 per acre and that appeared to meet petitioner's "criteria."[5]

LUBA concluded that petitioner had made an inadequate showing that it could not acquire alternative property in the same area that met its requirements and, therefore, had failed to demonstrate a substantial burden. LUBA noted that petitioner had submitted lists of available properties intended to demonstrate that there were no suitable properties for sale within the UGB and that the county in turn had submitted evidence of suitable parcels within the UGB. Although LUBA declined to adopt the county's "sufficiently diligent effort" test, LUBA determined that, in order to demonstrate a substantial burden, petitioner "must do more than

---

[5] As elaborated below, one of the analytical challenges in this case arises from the paucity of evidence pertaining to the nature and particulars of petitioner's property selection criteria. The two properties sold apparently were included in the list of 16 properties that petitioner's broker furnished. County staff stated that the properties were 13 acres and 13.5 acres in size, respectively. County staff also stated that the properties were subject to the FD-20 zone and indicated that, after being annexed to the city, the properties could be partitioned and any unneeded portion could be sold to a developer. The "FD" designation refers to Future Development.

present a * * * list of properties * * * and attempt to disqual-
ify" the properties "based on ill-defined 'criteria.' " Rather,
LUBA reasoned, it would not substantially burden petitioner
to seek out properties that were not listed for sale or take
other steps that land developers commonly take.

LUBA also reasoned that it was "immaterial" at that
point that petitioner already owned the subject property.
Relying on *Midrash Sephardi, Inc. v. Town of Surfside*, 366
F3d 1214, 1227 n 11 (11th Cir 2004), *cert den*, 543 US 1146
(2005), for the proposition that RLUIPA does not require
local governments to "shield" religious entities from the
"sometimes 'harsh reality' of the market," LUBA concluded
that it was not a substantial burden on petitioner's religious
practice to require petitioner to sell its existing property and
purchase other property that was already zoned to allow both
a church and a school, even if such property exceeded peti-
tioner's financial capabilities or required petitioner to trade
off some other desired characteristic such as access or visibil-
ity; according to LUBA, the only proper criteria for disquali-
fying property from consideration for RLUIPA purposes were
criteria related to religious exercise.[6]

Finally, having concluded that requiring petitioner
to purchase some other property was not a substantial bur-
den on petitioner's religious exercise, LUBA explained that it
need not decide whether evidence in the record that peti-
tioner already was "successfully" operating a school at a sep-
arate site from the site where it held religious services pro-
vided an alternative basis for affirming the county's decision
or, conversely, whether petitioner's evidence regarding the
necessity of locating the church and the school on the same
premises was sufficient to require a different result under the
"substantial burden" test.[7] As noted, LUBA affirmed the
county's decision.

---

[6] LUBA explained, in part, that, in the absence of evidence that particular
property has religious significance, it regarded undeveloped land as "relatively
fungible"; it also noted that petitioner knew or should have known at the time it
purchased the property that it was subject to CDC § 430-121.3.

[7] LUBA noted that petitioner's pastor, Lindsey, had testified that church doc-
trine requires church school students to have access to church staff and requires a
church sanctuary to be "adjacent to the classrooms." According to LUBA, that tes-
timony established only that the church and school were required to be "in rela-
tively close proximity." Again, however, LUBA determined that it was not required
to resolve that issue.

On judicial review, petitioner again renews its argument that the county's application to it of CDC § 430-121.3 imposed a substantial burden on its religious exercise in violation of RLUIPA. Specifically, petitioner asserts that LUBA gave improper weight to the fact that petitioner currently operates a school at a separate location from the location at which it conducts religious services; petitioner asserts that it presented sufficient evidence that the ability to offer classroom instruction and worship within the same building is critical to its religious mission.[8] Petitioner also emphasizes that it already has obtained permission to construct a church building and operate a day care facility on the subject property and urges us to consider that context in determining the extent of the burden imposed by the county's denial of the school use; according to petitioner, it is being forced to choose between adhering to its religious precepts and forgoing the government benefit of building the church, on the one hand, or building the church and forgoing its religious mission of operating a church school, on the other. Relying on the analysis in *Sts. Constantine, Helen Greek Orth. v. New Berlin*, 396 F3d 895 (7th Cir 2005), petitioner argues that merely requiring an applicant to purchase alternative property, considered in combination with the additional application proceedings that the new property would require, imposes a substantial burden on its religious practice and that it therefore was not required to show either that this specific property has "religious significance" to it or that there were no other suitable properties available.[9] Alternatively, petitioner argues that the subject property has religious significance to it because it already has obtained permission to construct a church thereon. Finally, petitioner argues that LUBA's "additional requirements," including the requirement that petitioner make offers for properties not

---

[8] Again, as noted, the record includes testimony by the church's pastor that it is important for students to have access during the school day to church staff and the church sanctuary; petitioner reiterated those points during oral argument before this court.

[9] Petitioner also cites a committee report for the Religious Liberty Protection Act of 1999, the findings for which were incorporated into the record in support of RLUIPA, for the proposition that Congress intended for RLUIPA to apply to properties currently owned by a religious entity. HR Rep No 219, 106th Cong, 1st Sess (1999).

currently on the market, considered in light of LUBA's conclusion that unaffordability is not relevant, themselves impose substantial burdens on petitioner.

In its response, the county first asks us to strike petitioner's arguments based on the ostensible fact that a church will be built on the subject property; as we understand the county's argument, that fact should not be assumed because the decision that is at issue in this judicial review proceeding—and therefore is not final—included the approval of the church use. The county also contends that petitioner failed to raise below the issue whether the delay and expense associated with seeking other properties constitutes a substantial burden.

Turning to the merits, the county argues that the record demonstrates that locating the school within the church building was a matter of mere practical convenience and not a matter of religious belief. The county also argues that, in any event, the issue is whether it substantially burdens petitioner's religious exercise to deny the requested school use *on the subject property*. The county argues that it does not, because there is no evidence that this particular property has religious significance or that seeking out and purchasing other property would be a substantial burden; the county also notes that, aside from the initial purchase of the property, petitioner has not yet made an extensive investment in it such as by constructing the church building.

In addition, the county argues that RLUIPA's protections do not apply "where the property owner's choice creates the alleged burden"—here, the choice to buy less expensive rural property rather than urban property where a school would be allowed outright. Relatedly, the county also contends that LUBA correctly concluded that petitioner failed to make a sufficient search for other properties and urges us to follow the reasoning of LUBA that petitioner's choice of property cannot be based on mere convenience or practical concerns and that, as a matter of law, the difficulty and costs of acquiring suitable property are not a substantial burden. The county contends that denial of the permit also does not constitute a substantial burden because it does not force petitioner to forgo providing religious education, but

merely prohibits it from providing it to an urban population in a rural location. Finally, the county contends that it has not denied petitioner's application while approving applications of other entities similarly situated, applied vague standards, acted for political reasons, or otherwise engaged in invidious discrimination or unfair treatment. Conversely, the county argues that interpreting RLUIPA to require approval of petitioner's school use when a nonreligious entity would not be entitled to approval would violate the Establishment Clause of the First Amendment to the United States Constitution.

Before turning to the applicable analysis, we address the county's initial points. First, we decline to "strike" petitioner's arguments purportedly based on the assumption that a church will be built on the subject property. The county has approved petitioner's requested church use. We also conclude that petitioner did not fail to preserve the issue whether the delay and costs associated with seeking an alternative property constitutes a substantial burden. Petitioner's submission of evidence and arguments pertaining to the availability of alternative property at the time of the hearing, as well as at the time it purchased the subject property, sufficed to raise that issue.

We turn to RLUIPA. 42 USC section 2000cc provides, in part:

"(a)   Substantial burdens

"(1)   General rule

"No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

"(A)   is in furtherance of a compelling governmental interest; and

"(B)   is the least restrictive means of furthering that compelling governmental interest."

Under RLUIPA, "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system

of religious belief." 42 USC § 2000cc-5(7)(A). RLUIPA expressly defines "religious exercise" to include "[t]he use, building, or conversion of real property for the purpose of religious exercise * * *." 42 USC § 2000cc-5(7)(B). *See also* 42 USC § 2000cc-2(b) (plaintiff has burden to show that regulation substantially burdens religious exercise; where plaintiff produces *prima facie* evidence, burden shifts to government as to other elements of claim).[10]

The United States Supreme Court has not yet had occasion to address the proper interpretation and application of the land use provisions of RLUIPA.[11] The Oregon Supreme Court has done so, however. In *Corp. of Presiding Bishop*, a city denied a church's application for a conditional use permit

---

[10] In a separate provision, RLUIPA also provides that no governmental body "shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution," 42 USC § 2000cc(b)(1), and that no governmental body "shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 USC § 2000cc(b)(2). This case involves only the "substantial burden" provision of RLUIPA set out at 42 USC § 2000cc(a).

[11] The United States Supreme Court has addressed the facial validity of provisions of RLUIPA pertaining to the imposition of substantial burdens on the religious exercise of institutionalized persons. 42 USC § 2000cc-1(a)(1), (2). In *Cutter v. Wilkinson*, 544 US 709, 125 S Ct 2113, 161 L Ed 2d 1020 (2005), after inmates of Ohio state institutions sought accommodation of the exercise of their "nonmainstream" religious practices, prison officials mounted a facial challenge to the relevant portion of RLUIPA, arguing, in part, that it improperly advances religion in violation of the Establishment Clause. In unanimously rejecting that challenge, the Court explained that the Establishment and Free Exercise clauses of the First Amendment "express complementary values [but] often exert conflicting pressures" and that its previous decisions had recognized that the clauses provide "space for legislative action neither compelled by the Free Exercise Clause nor prohibited by the Establishment Clause." *Id.* at 719. The Court concluded that the relevant provisions of RLUIPA constitute a "permissible legislative accommodation of religion" that is not barred by the Establishment Clause. *Id.* at 720. The Court recognized that a government entity properly applying the law must take adequate account of the burdens that a "requested accommodation" may impose on nonbeneficiaries; it also must ensure that the law is "administered neutrally among different faiths" and does not single out a particular religious sect for special treatment. *Id.* The Court also noted that, in the institutionalized-person's context, it did not understand RLUIPA to "elevate accommodation of religious observances over an institution's need to maintain order and safety" and that it had "no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns." *Id.* at 722. Concluding that RLUIPA "confers no privileged status on any particular religious sect, and singles out no bona fide faith for disadvantageous treatment," the Court held that, on its face, RLUIPA does not violate the Establishment Clause. *Id.* at 724.

for a new church building, on the grounds that the application did not meet various requirements for buffer zones and screening of the building. 338 Or at 459. The Supreme Court first explained that a person asserting that implementation of a land use regulation violates RLUIPA must demonstrate that a government actor has implemented the regulation in a manner that imposes a "substantial burden" on the person's religious exercise; if the person does so, the land use regulation must yield, unless the record shows that the regulation furthers a compelling governmental interest and does so in the least restrictive manner possible. *Id.* at 462. The court further explained that, in enacting RLUIPA, Congress intended the term "substantial burden" to be interpreted by reference to the United States Supreme Court's jurisprudence relating to the Free Exercise Clause of the First Amendment. *Id.* at 464.

After reviewing that jurisprudence, as well as considering then-existing interpretations of RLUIPA by lower federal courts, the court determined that a land use regulation imposes a substantial burden on religious exercise for the purpose of RLUIPA "only if it 'pressures' or 'forces' a choice between following religious precepts and forfeiting certain benefits, on the one hand, and abandoning one or more of those precepts in order to obtain the benefits, on the other." *Id.* at 465-66. *See also Guru Nanak Sikh Soc. v. County of Sutter*, 456 F3d 978, 988-89 (9th Cir 2006) (a land use regulation imposes a substantial burden on religious exercise when it is " 'oppressive' to a 'significantly great' extent" and imposes a "significantly great restriction or onus upon such exercise") (quoting *San Jose Christian College v. Morgan Hill*, 360 F3d 1024, 1034 (9th Cir 2004)); *Midrash Sephardi, Inc.*, 366 F3d at 1227 (determining that a "substantial burden" on religious exercise is more than an inconvenience and is "akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly," that is, pressure to forgo religious precepts or pressure that mandates religious conduct); *Civil Lib. for Urban Believers v. City of Chicago*, 342 F3d 752, 761 (7th Cir 2003), *cert den*, 541 US 1096 (2004) (holding that, in context of RLUIPA's broad definition of religious exercise, a land use regulation that imposes a substantial burden on religious

exercise is one that renders that exercise "effectively imprac-ticable"). *See generally* Daniel P. Lennington, *Thou Shalt Not Zone: The Overbroad Applications and Troubling Implica-tions of RLUIPA's Land Use Provisions*, 29 Seattle U L Rev 805 (2006) (reviewing history of RLUIPA; collecting cases interpreting and applying "substantial burden" test in land use context).

The Oregon Supreme Court then assessed the con-sequences of the city's denial of a conditional use permit in that case. The court determined that the city's denial did not impose a substantial burden on the church because the fur-ther action required by the denial—submission by the church of a new permit application—although it would involve costs and delays, would not pressure the church to forgo or modify the expression of a religious belief. *Corp. of Presiding Bishop*, 338 Or at 467. Finally, the court noted that, because the city's denial did not constitute a substantial burden on religious exercise, the court needed not consider whether the denial was justified by a compelling governmental interest or was the least restrictive means of furthering that interest. *Id.* at 467-68.

We turn to the application of RLUIPA to petitioner's property. Again, the county approved petitioner's requested special use of its property for a church and an associated day care facility. However, because petitioner's proposed school did not meet the criterion established in CDC § 430-121.3—requiring that rural schools "be scaled to serve the rural pop-ulation," in that the proposed student body primarily would be taken from urban areas—it denied petitioner's requested special use of the property for a school to be attended by peti-tioner's members' children. Specifically, the county and, sub-sequently, LUBA concluded, in effect, that it was incumbent on petitioner to purchase property on which its desired use would be permitted outright and that the cost of selling its existing property in order to now do so was not a substantial burden.

We disagree with the first part of that reasoning and reject it with dispatch. Nothing in RLUIPA requires a relig-ious institution, in order to take advantage of its provisions,

to purchase only property on which the desired use is permitted outright.[12] It follows that the dispositive question is whether implementation of CDC § 430-121.3 in relation to petitioner's property imposes a substantial burden on petitioner's religious exercise for the purpose of RLUIPA, that is, whether it forces petitioner to choose between adhering to a religious practice and obtaining a desired government benefit. We understand the relevant religious practice to be the operation of a school that is to be attended by petitioner's members' children and that is located on the same property as petitioner's church. The government benefit at issue is, of course, approval of that school use.

■    In this case, the county has attempted to apply a special use standard that would prevent petitioner, as it would any other applicant, from building a school on its rural property, where the school would serve a predominantly urban population. To the extent that other land that would have accommodated the desired combined uses was available within the area when petitioner applied for its permit, that factor logically is important to the determination whether, by applying the special use standard in this case, the county imposed a substantial burden on petitioner's religious exercise. However, there is no persuasive evidence in the record to suggest that such land was not available. As we now explain, we agree with LUBA's conclusion that petitioner failed to make an adequate showing that it could not reasonably acquire other property that met its requirements and, therefore, failed to demonstrate a substantial burden.

The departure point for our analysis is the Supreme Court's decision in *Corp. of Presiding Bishop*. In that case, the court described the pressure required to establish a substantial burden with reference to the Second Circuit's decision in *Westchester Day v. Village of Mamaroneck*, 386 F3d

---

[12] By its terms, RLUIPA provides that "[n]o government shall *impose or implement a land use regulation* in a manner that imposes a substantial burden on the religious exercise of a person[.]" 42 USC § 2000cc(a) (emphasis added). Logically, in an as-applied challenge, the prohibition stated in the emphasized phrase pertains to the property owner's currently owned property, that is, the property as to which the governing body is seeking to "impose or implement" the regulation. Nothing in the Oregon Supreme Court's discussion of RLUIPA in *Corp. of Presiding Bishop* indicates otherwise.

183 (2d Cir 2004), where a religiously affiliated school challenged, on RLUIPA grounds, the village's denial of a permit that would allow the school to construct a new building and renovate others. In *Westchester Day*, the Second Circuit found that the denial did not create a substantial burden on the school's religious exercise because the village

> "did not purport to pronounce the death knell of the School's proposed renovations in their entirety, but rather to deny only the application submitted, leaving open the possibility that a modification of the proposal, coupled with the submission of satisfactory data found to have been lacking in the earlier proceedings, would result in approval."

*Id.* at 188. The court noted that the denial of a specific proposal may constitute a substantial burden when the denial seems disingenuous, when curing the problems that formed the basis for the denial "would impose so great an economic burden as to make amendment unworkable," or when the cure itself directly affected religious exercise. *Id.* at 188 n 3. However, the court found that in that case a mere denial, without more, did not constitute a substantial burden.

In *Corp. of Presiding Bishop*, the court also discussed *Midrash Sephardi, Inc.*, and stated that

> "the city sought to enjoin synagogues from holding services in a hotel meeting room and a conference room leased from a bank. The injunction would have required the synagogues to relocate farther away from their congregants. The synagogues argued that the injunction would constitute a substantial burden because the religious beliefs of the congregants required them to walk to synagogue. The Eleventh Circuit held that requiring the congregants to walk the extra blocks did not constitute a substantial burden."

338 Or at 466. The court continued:

> "We agree with the reasoning of the cases discussed above, and, on that basis, we conclude that a government regulation imposes a substantial burden on religious exercise only if it 'pressures' or 'forces' a choice between following religious precepts and forfeiting certain benefits, on the one hand, and abandoning one or more of those precepts in order to obtain the benefits, on the other. *See Sherbert*

[*v. Verner*], 374 US [398,] 404, [83 S Ct 1790, 10 L Ed 2d 965 (1963)] (stating that test)."

*Id.*

*Corp. of Presiding Bishop* is highly instructive but it, alone, does not resolve the present case without reference to the federal decisions, and their progeny, on which the court relied. That is so, for among other reasons, because this case, unlike *Corp. of Presiding Bishop*, involves an outright denial of a proposed land use based on the application of an objectively framed special use standard.

The cases addressing alleged infringements of free exercise rights may be usefully categorized into two groups. On the one hand, courts routinely find substantial burdens where compliance with a statute itself violates the individual's religious beliefs and noncompliance may subject him or her to criminal sanctions or the loss of a significant government privilege or benefit. *See Wisconsin v. Yoder,* 406 US 205, 92 S Ct 1526, 32 L Ed 2d 15 (1972) (compulsory high school attendance law contrary to Amish religious beliefs); *Sherbert,* 374 US 398 (denial of unemployment benefits to Seventh Day Adventist who refused to work on Saturday Sabbath). On the other hand, courts often have been more reluctant to find a violation where compliance with the challenged regulation makes the practice of one's religion more difficult or expensive, but the regulation is not inherently inconsistent with the litigant's beliefs. *See Lakewood, Ohio Cong. of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio,* 699 F2d 303, 306 (6th Cir), *cert den,* 464 US 815 (1983) (holding that "[i]nconvenient economic burdens on religious freedom do not rise to a constitutionally impermissible infringement of free exercise"); *see also Episcopal Student Foundation v. City of Ann Arbor,* 341 F Supp 2d 691, 706 (ED Mich 2004) (quoting *Lakewood,* 699 F2d at 307).

In view of those distinct branches of authority, it is useful to review the Supreme Court decisions that have shaped free exercise jurisprudence. In *Sherbert,* the Supreme Court considered whether the denial of unemployment benefits to a Seventh Day Adventist whose employment was terminated for refusing to work on her Sabbath constituted a substantial burden on her religious free exercise. 374 US 398.

The Court concluded that it did because the state's denial "force[d] her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other[.]" 374 US at 403-04. The Court held that "to condition the availability of benefits upon this applicant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties." *Id.* at 406.

In *Yoder*, 406 US at 218, the Supreme Court addressed the issue of whether a compulsory school attendance law that conflicted with Amish religious beliefs, and that imposed criminal sanctions for noncompliance, violated the Free Exercise Clause. The Court held in the affirmative. In particular, the Court stated that "[t]he impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs."[13] *Id.*

Applying the principles set out in *Sherbert* and *Yoder*, in *Lakewood*, the Sixth Circuit addressed a congregation's challenge to its city's comprehensive zoning plan, which prohibited the congregation from constructing a place of worship on land owned by the congregation. 699 F2d at 305-08. Under the zoning plan, only 10 percent of the city's

---

[13] Applying the same principles, more recently the Supreme Court declined to find a substantial burden in *Lyng v. Northwest Indian Cemetery Prot. Assn.*, 485 US 439, 108 S Ct 1319, 99 L Ed 2d 534 (1988), and *Locke v. Davey*, 540 US 712, 124 S Ct 1307, 158 L Ed 2d 1 (2004). In *Lyng*, various Native American groups challenged the construction of a paved road through federal public land, asserting that the construction would harm sacred areas traditionally used for religious rituals. Although the road "would interfere * * * with [the plaintiffs'] ability to pursue spiritual fulfillment according to their own religious beliefs," 485 US at 449, the Court concluded it would neither coerce the plaintiffs into violating their religious beliefs, nor "penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Id.*

In *Locke*, 540 US at 720-21, the Supreme Court held that a state scholarship program that prohibited the use of scholarship funds for students pursuing theology degrees did not violate the Free Exercise Clause. In so holding, the Court noted that the program "impose[d] neither criminal nor civil sanctions on any type of religious service or rite," and did not "require students to choose between their religious beliefs and receiving a government benefit."

property was designated as land on which a church could be built. The Sixth Circuit observed that the *Lakewood* ordinance did not prohibit the congregation, or any other faith, from worshiping in the city altogether. The congregation remained free to practice its faith through worship "whether the worship be in homes, schools, other churches, or meeting halls throughout the city." *Id.* at 307.

The court also rejected the congregation's claim that the zoning ordinance imposed a substantial burden because land in commercial zoning districts (in which churches were permitted uses) was more expensive and less conducive to worship than the lot owned by the church. Although the "lots available to the Congregation may not meet its budget or satisfy its tastes," the Sixth Circuit held that the Free Exercise Clause "does not require the City to make all land or even the cheapest or most beautiful land available to churches." *Id.* The court summarized its conclusion that the zoning ordinance did not impose a substantial burden on the congregation's free exercise by stating:

> "[The ordinance] does not pressure the Congregation to abandon its religious beliefs through financial or criminal penalties. Neither does the ordinance tax the Congregation's exercise of its religion. Despite the ordinance's financial and aesthetical imposition on the Congregation, we hold that the Congregation's freedom of religion * * * has not been infringed."

*Id.* at 307-08.

Of similar import is *Christian Methodist Episcopal Church v. Montgomery*, CV22322, 2007 WL 172496, at *8-9 (DSC Jan 18, 2007). In that case, the court held that a municipal zoning ordinance that required a property owner or its tenant assignee to apply for a special land use approval did not impose a substantial burden under RLUIPA. In reaching its conclusion, the court relied on a Fourth Circuit decision that was decided under the First Amendment before the passage of RLUIPA. What the court said about that case bears emphasis here:

> "In *Christ College, Inc., et al v. Board of Supervisors, Fairfax Co., et al,* 944 F2d 901, 1991 WL 179102 (4th Cir 1991) (unpublished) [*cert den,* 502 US 1094, 112 S Ct 1169,

117 L Ed 2d 414 (1992)], Christ College alleged that the Board of Supervisors of Fairfax County violated the College's free exercise of religion as a result of the Board's denial of the College's application for a special exception to the County's zoning laws to build and operate a schoolhouse in an area zoned residential. The County permitted a school to operate on a property zoned for commercial or industrial use as a matter of right; however, it required a school to obtain a special exception to the zoning laws before it located in a[n] area zoned for residential use.

"The Fourth Circuit held that the College failed to establish the first element of a free exercise claim; it did not prove that the zoning laws burdened its exercise of religion. The Court determined that the County's zoning provisions did not absolutely prohibit operation of private or parochial schools because the provisions permitted such a school to be located in either commercial or industrial zones without any special exception. Additionally, with a special exception, such schools could locate within residential zones. The College did not show that conformance to the County's zoning regulations would impair any aspect of its free exercise of religion. 'They have not shown how their rights may only be exercised in a facility located in a residential zone, nor that conforming to the special exception requirements laid down by Fairfax would in any constitutionally significant way burden those rights.' 1991 WL 179102 at *4.

"The Court acknowledged that the County zoning laws made it more difficult for the College to be located on the property of its choice; however the fact that local regulations limit the geographical options of a religious school * * * does not prove that any party's right to free exercise is thereby burdened. There must at least be some nexus between the government regulation-here, a zoning law-and impairment of ability to carry out a religious mission. It is not enough that an entity conducting a religious program of mission would prefer to be located on residential property. That preference must be linked to religious imperative. No such [link] was proved here and the court was correct in concluding the zoning regulations did not burden appellants' free exercise of religion."

*Montgomery*, 2007 WL 172496 at *8-9.

Also pertinent is the Seventh Circuit's observation that:

"Application of the substantial burden provision to a regulation inhibiting or constraining *any* religious exercise * * * would render meaningless the word 'substantial,' because the slightest obstacle to religious exercise incidental to the regulation of land use—however minor the burden it were to impose—could then constitute a burden sufficient to trigger RLUIPA's requirement that the regulation advance a compelling governmental interest by the least restrictive means."

*Civil Lib. for Urban Believers*, 342 F3d at 761 (emphasis in original). In that case, an association of area churches challenged a city ordinance, alleging that it violated RLUIPA. *Id.* at 755. The court decided that the plaintiffs had not met the requirement of showing a substantial burden and held that a regulation must bear "direct, primary, and fundamental responsibility for rendering religious exercise * * * effectively impracticable" in order to impose a substantial burden. *Id.* at 761.

The Seventh Circuit's standard for showing a substantial burden under RLUIPA apparently was relaxed somewhat in *New Berlin*. In that case, the court held that the defendant municipality had created a substantial burden by requiring a church to "search[ ] around for other parcels of land" rather than rezone property the church already owned. *New Berlin*, 396 F3d at 901. Other churches had facilities in the same area as the subject land. However, the city in that case was concerned that, if the property were rezoned, a subsequent owner might build a school or other nonreligious facility, and the church thus agreed to a restrictive covenant disallowing such an arrangement. *Id.* at 900-01. The court concluded that the city had no legitimate concerns on which to base its denial of the rezoning but that it nevertheless had swamped the petitioner with a tide of "incompetent" red tape that the court excoriated as unjustified. *Id.* at 900 (describing the city as "flaunting as it were its own incompetence"). Bluntly, the court was concerned that the municipality had given the petitioner the bureaucratic run around and that the standardless discretion that inhered in its decisional process could mask a discriminatory motive. *Id.*

The Seventh Circuit recently distinguished that circumstance from one where the local government's "discretion

is narrowly circumscribed by [its] Zoning Regulations, which set forth the various factors to be considered by [it] in addressing an application for a special use permit." *Vision Church v. Village of Long Grove,* 468 F3d 975, 990-91 (7th Cir 2006) (distinguishing *New Berlin*). The same distinction applies here, where the applicable use standard is clear and not subject to ad hoc manipulation. Nor is there any claim of incompetence or bad faith on the county's part in this case. It is true that, in *New Berlin,* the Seventh Circuit implied that RLUIPA affords religious institutions greater protection than secular institutions. *Id.* at 900 ("A separate provision of the Act forbids government to 'impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.' "). However, it is easy to overstate the significance of that point; it has limits, and the question is where they lie in cases like the present one.

The United States District Court for the Northern District of Illinois noted in a recent case interpreting *Civil Lib. for Urban Believers* and *New Berlin* that RLUIPA does not entitle religious groups to establish houses of worship anywhere they want. *Petra Presbyterian Church v. Village of Northbrook,* 409 F Supp 2d 1001, 1007 (ND Ill 2006). In that case, a church was not permitted to open in an industrial area, because that was prohibited by the zoning laws of the defendant city, and the church sued the city under RLUIPA. *Id.* at 1003. In holding for the defendant, the court noted that the plaintiff had failed to "account for other areas of Northbrook where churches are allowed," including the "availability of land in * * * commercial districts where churches are allowed with a permit." *Id.* at 1007. Other courts also have considered the availability of other land in the area as a factor in determining whether a substantial burden existed. *See Lakewood,* 699 F2d at 307 (although "[t]he lots available to the Congregation may not meet its budget or satisfy its tastes," the Free Exercise Clause "does not require the City to make all land or even the cheapest * * * land available to churches"); *see also Lighthouse for Evangelism v. City of Long Branch,* 100 Fed Appx 70 (3rd Cir 2004), *on remand,* 406 F Supp 2d 507 (D NJ 2005) (finding no substantial burden where the institution was not completely

excluded from the city and could have operated in other districts within the city by right, such as in a commercially zoned district); *Episcopal Student Foundation*, 341 F Supp 2d at 706; *Christ College, Inc.*, 1991 WL 179102.

The foregoing cases are consistent with the standard adopted by the Oregon Supreme Court in *Corp. of Presiding Bishop*, 338 Or 453. Here, as noted, the county ultimately denied petitioner's application, whereas, in *Corp. of Presiding Bishop*, the court determined that further applications were not foreclosed but were, indeed, encouraged. However, the court's formulation of the substantial burden standard suggests that, at the least, it would require petitioner to demonstrate that it could not reasonably locate and acquire an alternative site for its desired combined uses. *See Corp. of Presiding Bishop*, 338 Or at 465-66. Although it is not possible to articulate a bright line test for what might constitute a sufficient showing that no reasonable alternatives existed in every case, such a showing must, at the least, demonstrate that a land use decision has forced the applicant to forgo its religious precepts.

That determination is made more difficult in this case because petitioner made little effort to clearly define its property selection criteria or to explain how the failure to satisfy those criteria would require it to forgo its religious precepts. For example, there was no evidence in the record that, in the absence of a particular "access to the property" or "exposure of property"—or, for that matter, a particular price or parcel size—petitioner would be required to forgo its religious precepts. Said another way, there was insufficient evidence that petitioner's religious exercise would have been substantially burdened by buying one of the 29 properties on the market in January 2006 or one of the 16 parcels identified by the county.

Rather than undertake the task of clearly defining its property selection criteria and explaining how the failure to satisfy them would require it to forgo its religious precepts, petitioner essentially has taken the position that the need to look for and acquire other property is itself a substantial burden, because such a search would be time consuming and costly. However, such a showing is insufficient. There was no

evidence that a reasonable search and acquisition would have required the interruption or cessation of the church's present activities; it merely would have required a delay and some unknown expense. Moreover, a reasonable search and acquisition that would not require petitioner to forgo religious precepts might entail a balancing of petitioner's preferences with respect to the size and location of potential sites, a not uncommon compromise in all property selection processes. In addition, it might be reasonable to seek out properties that were not listed for sale or take other steps that land developers commonly take in locating property. But the record does not elaborate on those or any other material factors in this case.

Because petitioner failed to demonstrate that upholding the county's land use decision would force petitioner to forgo its religious precepts, we conclude that petitioner failed to show that the county has imposed a substantial burden under RLUIPA.

We conclude with a brief examination of the dissent's treatment of the issues in this case. We confine our focus to four definitive problems.

First, we and the dissent divide over the issue whether a religious institution is substantially burdened merely because, in order to comply with an applicable land use regulation, it may be required to sell existing property and purchase alternative property. The dissent is somewhat inconsistent about the issue. At one point, the dissent states that it "do[es] not mean to suggest that implementation of a land use regulation in a manner necessitating the purchase of alternative property will always constitute imposition of a substantial burden * * *." 211 Or App at 483 n 10 (Wollheim, P. J., dissenting). However, the dissent never explains what would make purchasing alternative property a burden in some cases but not others. It cites a number of cases that recognize the significance of being required to sell existing property and purchase alternative property. 211 Or App at 481-83 (Wollheim, P. J., dissenting). But most of those cases are distinguishable on their facts from the circumstances here.

As discussed, the most sensible way to understand *New Berlin* focuses on the court's concern that the municipality in that case improperly had exercised standardless discretion in its decisional process; any other understanding of the decision is difficult to square with the same court's (albeit a different panel's) decision in *Civil Lib. for Urban Believers.*[14]

The dissent also relies on the Ninth Circuit's decision in *Guru Nanak Sikh Soc.* As the dissent points out, that case stands for the proposition that, to prove a substantial burden, a religious group need not show that there was *no other* parcel of land on which it could carry out the relevant religious exercise. We agree. However, that proposition does not resolve the issue at hand, which is what showing is required. As elaborated below, the dissent does not provide any assistance in that regard.

Most of the remaining cases on which the dissent relies are distinguishable because the petitioning religious institutions showed that locating and purchasing alternative property on which their proposed uses were permitted would create an unreasonable economic burden. *See Living Water Church v. Charter Tp. Of Meridian,* 384 F Supp 2d 1123, 1133-34 (WD Mich 2005) (substantial burden found where the petitioner was "a small church with limited funds"); *see also Greater Bible Way Temple v. Jackson,* 268 Mich App 673, 708 NW2d 756, 762 (2005), *rev allowed,* 474 Mich 1133, 712

---

[14] The court in *New Berlin* was satisfied with the following explanation:

"The district judge inferred from language in our [*Civil Lib. for Urban Believers*] decision * * * that to satisfy this requirement the Church would have to show that there was no other parcel of land on which it could build its church. But in [*Civil Lib. for Urban Believers*] the plaintiff churches were challenging Chicago's zoning ordinance, which—unlike New Berlin's—allows churches to build in areas zoned residential, though it requires them to obtain a permit to build in areas zoned commercial. The requirement of seeking a permit, given that churches don't need one to build in a residential zone, seemed to the panel majority in [*Civil Lib. for Urban Believers*] not to place a substantial burden on the churches. *Id.* at 761-62. The Church in our case doesn't argue that having to apply for what amounts to a zoning variance to be allowed to build in a residential area is a substantial burden. It complains instead about having either to sell the land that it bought in New Berlin and find a suitable alternative parcel *or be subjected to unreasonable delay by having to restart the permit process to satisfy the Planning Commission about a contingency for which the Church has already provided complete satisfaction.*"

396 F3d at 899-900 (emphasis added). In light of the emphasized language, we adhere to our understanding of the essential differences between the two cases.

NW2d 728 (2006) (substantial burden found where applicant submitted evidence showing that it could not afford to purchase different property).[15]

The dissent labors to distinguish some of the cases that we discuss because those cases, in turn, cited the Supreme Court's decision in *Braunfeld v. Brown*, 366 US 599, 81 S Ct 1144, 6 L Ed 2d 563 (1961). As the dissent sees it, the effect of the regulation in *Braunfeld* (a Sunday business ban case), "was more 'indirect' * * * than the direct effect of the [one] at issue here." 211 Or App at 477 (Wollheim, P. J., dissenting). The dissent pursues that theme for several pages, but its criticism perplexes us. We have not cited *Braunfeld*, because we appreciate that it is sensible to steer more closely to the land use problem at hand. The fact that some courts facing similar circumstances have seen fit to discuss *Braunfeld* is not, to our thinking, especially informative. Unlike the dissent, we see no benefit in speculating about which effect is more "indirect," the effect in *Braunfeld* or the effect of the regulation in this case. Such a detour only serves to mask the evidentiary shortcomings in petitioner's case.

---

[15] The dissent also relies on *Vision Church*. 211 Or App at 482 (Wollheim, P. J., dissenting). Although, as the dissent notes, the Seventh Circuit in that case observed that the municipality merely had required modifications to, not ultimately denied, the church's application, 468 F3d at 1000, its primary rationale for rejecting the church's substantial burden argument undercuts the dissent's reasoning. The court stated:

> "Lastly, we turn to Vision's contention that the enactment of the Assembly Ordinance constitutes a 'substantial burden' on its right to the free exercise of religion. The Assembly Ordinance is facially neutral; it applies to the new construction of *all* public use buildings, regardless of their purpose, including not only 'religious institutions,' but also 'aquariums, libraries, museums, private schools, and other similar uses,' * * *. According to Vision, despite its neutrality, the Ordinance was passed for the sole purpose of forcing Vision to reduce the size of its proposed complex, which, in turn, substantially burdens Vision's potential success. Besides temporal proximity between Vision's dispute with the Village over a special use permit and the enactment of the Ordinance, there is no evidence in the record to support this claim. Even if Vision was targeted by the Assembly Ordinance, this does not mean that it was targeted *because of religion:* The Plan Commission was concerned about the size of the church complex and its effect on the character of the Village, concerns separate and independent from the religious affiliation (or lack thereof) of the institution seeking to build on the land."

*Id.* at 999 (emphasis in original). Thus, *Vision Church* is consistent with our rationale for distinguishing *New Berlin* from the circumstances here.

Its failure to adequately confront that proof deficiency is the second definitive problem with the dissent's analysis. At various points the dissent concludes that petitioner has been pressured or forced to forgo its religious precepts, 211 Or App at 472-73, 483-84 (Wollheim, P. J., dissenting), and that "locat[ing] and purchas[ing] new property where the school use is not conditioned on the criterion imposed under [the regulation is] a significant burden in and of itself * * *." *Id.* at 483 (Wollheim, P. J., dissenting). Yet the dissent never articulates what the record actually shows in that regard, that is, what evidence petitioner has offered to demonstrate the burden on its religious practices and the "pressure" or "force" that results from that burden. The dissent also appears to ignore the fact that petitioner rejected properties without clearly defining its criteria. In short, the dissent never confronts the vacuum of proof in the record that searching for or relocating to other property would require petitioner to forgo its religious beliefs.

Third, the dissent overplays the notion that implementation of the county's regulation "has the effect of forcing Timberline Baptist Church to forgo or modify its religious practice of operating a school for the benefit of its members' children at the same location as its approved church." *Id.* at 483 (Wollheim, P. J., dissenting). In a real sense, the consequences of the implementation of the regulation are merely *economic*. There is no evidence that petitioner must forgo operating a school for the benefit of its members' children in the same location as petitioner's church; at most it may have to pay more money to do so. As LUBA pointed out, there is nothing of particular religious significance about the subject parcel of land; it merely was less expensive because it is not located within the UGB. The dispositive issue—despite the dissent's focus on the impact of operating the school and church separately—is whether petitioner carried its burden of showing a substantial burden in the absence of a reasonable search for alternative properties where a school *and* church could be built.

Fourth, and finally, the dissent makes one further effort to surmount the foregoing problems. It asserts that, in addition to the burden of seeking and purchasing alternative property, the application of the county's special use standard

would result in another burden on petitioner's religious precepts. Specifically, the dissent asserts:

> "Timberline Baptist Church's religious precept is the operation of a religious school on the same property as its church. The benefit is the county's approval of the special use permit for the church and day care facility. Timberline Baptist Church is being 'pressured' or 'forced' to give up the approved church and day care facility on the property it owns, or to 'abandon' its religious precept of operating a church and religious school on the same property and keep the approval of building a church on its property."

211 Or App at 473 (Wollheim, P. J., dissenting). Later, the dissent characterizes the "forfeit[ure]" of petitioner's "previously obtained church use approval" as a substantial burden that would result from the separate burden associated with looking for and purchasing alternative property. *Id.* at 483 (Wollheim, P. J., dissenting).[16] As the dissent apparently sees things, getting some benefits from the applicable land use regulations pertaining to a particular parcel of property, but not everything that it wants, would cause petitioner to forgo the precept that all of its desired uses should converge in a single facility and thereby would cause it to suffer a substantial burden under RLUIPA. We disagree.

The dissent's argument is a bootstrap. By purchasing the subject parcel for the purpose of colocating all three of its desired uses, even though only two of those uses were authorized under the county's special use standard, petitioner has undertaken to unilaterally determine the portions of the law with which it must comply. But things are not that simple. As it relates to the subject property, the benefit to which petitioner is entitled under the county's special use standard is a limited one. That benefit is the right to build a

---

[16] The dissent also may think of the following hypothetical scenario as describing a substantial burden as "[s]pecifically, in order to obtain the requested school use approval, Timberline Baptist Church must either operate a school primarily for children other than the children of its members or must arrange for most of its members to move outside the [UGB]." 211 Or App at 483 (Wollheim, P. J., dissenting). Because there is no evidence that petitioner would, under any circumstance, do either of those things, we assume that the dissent raises that prospect only to emphasize that it is important for petitioner to operate in a facility that accommodates all three of its desired uses. Because there is no evidence that it is a realistic scenario, we do not address it further.

facility that will accommodate two, not three, of petitioner's desired uses. The fact that petitioner would like to treat the limits of that benefit as a substantial burden does not make it proper to do so. Neither petitioner nor the dissent has cited a single case in which a court has allowed a land use applicant to successfully characterize the limits of a land use benefit as a substantial burden in circumstances such as these.[17] It follows that the dissent's effort to characterize "the forfeiture of petitioner's previously-obtained church use approval" as a separately cognizable substantial burden is misplaced.

To summarize, in order to establish that the county's application of the county's special use standard substantially burdened petitioner's free exercise of its religious beliefs, petitioner had to demonstrate that the county's decision would require it to forgo its religious precepts because it could not reasonably locate and acquire an alternative site for its proposed combined uses. Petitioner failed to make such a showing. More fundamentally, petitioner did not

---

[17] There is a Free Exercise principle that bears some, albeit only partial, resemblance to the dissent's argument, but which actually undercuts that argument. Although the dissent has not mentioned it, that principle was discussed in *Episcopal Student Foundation.* The court in that case explained *Sherbert* and *Lakewood* in this way:

"In *Sherbert,* the Supreme Court considered whether the denial of unemployment benefits to a Seventh Day Adventist whose employment was terminated for refusing to work on her Sabbath constituted a substantial burden on her religious free exercise. The Court concluded that it did because the state's denial 'force[d] her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning the precepts of her religion in order to accept work, on the other[.]' *Sherbert,* [374 US at 399-401]. The Court went on to hold, '[to] *condition the availability of benefits upon this applicant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties.*' [*Id.* at 404-06.] *The Sixth Circuit later characterized the infringement found in Sherbert as 'severe, life-threatening economic sanctions.'* Lakewood, 699 F2d at 306."

*Episcopal Student Foundation,* 341 F Supp 2d at 702 (emphasis added). Of course, the emphasized principle makes sense as it was applied in *Sherbert* and as it was explained in *Lakewood.* However, nothing that would trigger its application has occurred in this case.

As discussed, petitioner offered no proof that it would suffer an unreasonable economic consequence by searching for or purchasing other property that would accommodate all three of its desired uses. Assuming without deciding that the *Sherbert* principle otherwise might apply to the present circumstances, in the absence of proof of such an unreasonable economic consequence, petitioner failed to show that the county conditioned the availability of two approved uses of the subject property on petitioner's willingness to forgo a precept of its religious faith.

clearly define its property selection criteria or explain how the failure to satisfy those criteria would require it to forgo its religious exercise. Accordingly, petitioner failed to establish that the application of the county's standard imposed a substantial burden under RLUIPA.

Affirmed.

**BREITHAUPT, J. pro tempore,** concurring.

I concur with the majority in all respects and write only to call attention to certain matters of interest in cases such as this.

First, RLUIPA is a federal statute and, as such, the first inquiry must be whether Congress had the power to adopt the statute. In RLUIPA, Congress has constrained the application of the statute so that the bases of congressional authority are stated as preconditions to the application of the statute. RLUIPA specifies that the section at issue here, 42 USC section 2000cc(a)(2) (2000), applies only to cases in which, summarizing the statute:

(A) the substantial burden is imposed in a program or activity that receives federal financial assistance;

(B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several states, or with the Indian tribes; or

(C) the substantial burden is imposed in the implementation of a land use regulation as part of which individualized assessments are made.

The majority notes that it is assumed that the predicate listed in (C) above is present in this case. However, if that assumption were not made, it would be necessary for the party seeking the benefit of the federal statute to establish one of the other two bases for application of the statute. At least one court has expressed the view that the "Commerce Clause" predicate found in (B) above itself constitutes an extension of federal power beyond the limits of the United States Constitution. *Elsinore Christian Center v. City of Lake Elsinore*, 291 F Supp 2d 1083 (CD Cal 2003). It will always be helpful to courts for counsel in cases such as this to address

the preconditions for application and the related issues of congressional power.

Second, petitioner seeks to gain some benefit from the fact that it purchased the property in question and might suffer an economic penalty if it had to sell the property and locate within the urban growth boundary. However, petitioner presumably knew or could have determined what the zoning rules were that applied to this property. Further, petitioner did not need to purchase the property in order to determine if it could proceed with its plans. RLUIPA applies even in cases where the claimant's interest is only an option or contract right to acquire the land affected by a land use regulation. 42 USC § 2000cc-5(5) (2000). The record here indicates that the land in question is essentially fungible farmland. Accordingly, an option to acquire such property would be, presumably, relatively inexpensive and a condition to closing under a purchase contract relating to zoning approval would, presumably, have been available. In any case, absent a showing by the petitioner that such an inexpensive option or closing condition was not available, I would not give petitioner any credit for having proceeded with a purchase that may have produced damage of petitioner's own making.

**WOLLHEIM, P. J.,** dissenting.

After acquiring property outside the urban growth boundary (UGB) of the City of Sherwood, Timberline Baptist Church sought approval from Washington County for special uses of the property for a church, a day care facility, and a religious school. The proposed facilities were intended to serve the church's members, the majority of whom lived within the UGB. The county granted special use and development review approvals for construction of the church and use as a day care facility. However, based on one of several requirements in the county ordinance pertaining to school uses—that at least 75 percent of the student body of a rural school must be students residing in rural areas—the county denied the requested special use of the property for a religious school. The Land Use Board of Appeals (LUBA) affirmed the county's decision.

On judicial review, the issue is whether LUBA correctly determined that Washington County's denial of a special use permit for a religious school, while at the same time approving a special use permit for both a church and day care facility in the same building, did not constitute a "substantial burden" on Timberline Baptist Church's religious exercise for the purpose of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 USC §§ 2000cc to 2000cc-5 (2000). The majority concludes that the county's denial of a special use permit to use the approved church for a religious school did not constitute a substantial burden under RLUIPA. For the reasons set out below, I would conclude that the county's decision constituted a substantial burden under RLUIPA and would reverse and remand for a determination of whether denial of the special use permit for a religious school furthers a compelling governmental interest and is the least restrictive means of doing so. I, therefore, respectfully dissent.

### Substantial Burden under RLUIPA

In *Corp. of Presiding Bishop v. City of West Linn*, 338 Or 453, 111 P3d 1123 (2005), the Oregon Supreme Court considered whether a city's denial of a conditional use permit to build a new church meetinghouse constituted a substantial burden for RLUIPA purposes. The court explained that, in enacting RLUIPA, Congress intended the term "substantial burden" to be interpreted by reference to the United States Supreme Court's jurisprudence relating to the Free Exercise Clause of the First Amendment to the United States Constitution. 338 Or at 464. The court reviewed three such cases— *Hobbie v. Unemployment Appeals Comm'n*, 480 US 136, 140-41, 107 S Ct 1046, 94 L Ed 2d 190 (1987); *Thomas v. Review Board*, 450 US 707, 717-18, 101 S Ct 1425, 67 L Ed 2d 624 (1981); and *Sherbert v. Verner*, 374 US 398, 403-08, 83 S Ct 1790, 10 L Ed 2d 965 (1963)—and determined that, under the Free Exercise Clause analyses therein, a "substantial burden" is one that "pressure[s] someone to forgo or modify the expression of a religious belief." *Corp. of Presiding Bishop*, 338 Or at 465.

Because of their "similarity" to the case before it, the Oregon Supreme Court also found instructive the analyses in

several federal circuit court cases.[1] First, the court noted that, in *Westchester Day v. Village of Mamaroneck*, 386 F3d 183 (2d Cir 2004), the Second Circuit found no substantial burden where the government's denial of a permit application was not the "death knell" of the application, but left open the possibility that the government would approve a modified application. The Second Circuit also explained that a denial is more likely to constitute a substantial burden when it is "disingenuous" or when curing the problems on which the denial was based would impose a great financial burden or would directly affect religious practice. *See Corp. of Presiding Bishop*, 338 Or at 465-66 (citing and quoting *Westchester Day*, 386 F3d at 188, 188 n 3). Next, in *San Jose Christian College v. Morgan Hill*, 360 F3d 1024 (9th Cir 2004), the Ninth Circuit held that the mere requirement that the applicant submit a new and more complete application did not impose a substantial burden. *See Corp. of Presiding Bishop*, 338 Or at 466 (citing and quoting *San Jose Christian College*, 360 F3d at 1035). Finally, in *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F3d 1214 (11th Cir 2004), *cert den*, 543 US 1146 (2005), two synagogues had challenged a zoning ordinance that excluded religious institutions from the town's business district, and the town sought to enjoin synagogue members from meeting in leased space within the district. The Eleventh Circuit held that requiring congregants to walk farther to attend services did not constitute a substantial burden. *See Corp. of Presiding Bishop*, 338 Or at 466 (citing *Midrash Sephardi, Inc.*, 366 F3d at 1228.

The Oregon Supreme Court explained that it "agree[d] with the reasoning" of those federal circuit court cases. It thus concluded that, for purposes of RLUIPA, a land use regulation imposes a substantial burden on religious exercise "only if it 'pressures' or 'forces' a choice between following religious precepts and forfeiting certain benefits, on the one hand, and abandoning one or more of those precepts

---

[1] Decisions from the various federal circuit or district courts are helpful only to the extent that their analyses are persuasive; those decisions are not controlling. We are, of course, bound by our Supreme Court's interpretation of RLUIPA. Additionally, we would be bound by the United States Supreme Court's interpretation of RLUIPA, if the Supreme Court had interpreted the land use provisions of RLUIPA.

in order to obtain the benefits, on the other." 338 Or at 465. The court applied that test to the facts before it:

> "We agree with the church that the denial of the [conditional use permit] has several adverse consequences for the church's effort to build a meetinghouse. The city's decision requires the church to submit a new permit application that reflects the use of a greater portion of an available lot, provides for additional buffering, and includes all of the required noise studies. That resubmission necessarily will impose additional expenses on the church. It also will create delay, during which church members will continue to face crowded conditions at their [current] meetinghouse and the longer drive required to get there.

> "Those hardships, however, do not constitute 'substantial burden[s]' under RLUIPA. The church already has indicated that it would be possible to acquire more land to provide the necessary buffering space between the parking lot and Shannon Lane that the city has requested. The expenses associated with submitting a new application do not constitute a substantial burden in and of themselves, nor does the requirement of submitting the application. The siting of a large building often involves multiple applications by the builder, changes requested by a city planning commission or city council based on zoning and similar requirements, and related legal, architectural, and engineering costs. The city gave specific reasons for denying the first application, and nothing in the record indicates that the city would not approve a revised application that met its concerns. There is no evidence in the record to suggest that the crowded conditions at the meetinghouse have forced the church to turn away anyone who wished to attend church or to eliminate or reduce church activities. Nor is there any evidence in the record to suggest that the city's denial was motivated by religious animus. In short, nothing in the record suggests that requiring the church to submit a new application would pressure the church to forgo or modify the expression of a religious belief, as described in *Sherbert*, *Thomas*, and *Hobbie*. Moreover, the hardships imposed on the church are likely to be relatively short-lived."

338 Or at 467 (third brackets in original). Finally, the court noted that, because the denial of the permit did not constitute a substantial burden on the church's religious exercise, it needed not consider whether the denial served a compelling

governmental interest, whether the denial was the least restrictive means of furthering that interest, or whether RLUIPA violates the First Amendment. *Id.* at 467-68.

As does the majority, I treat the Oregon Supreme Court's decision in *Corp. of Presiding Bishop* as the "departure point" for analysis of this case. *See* 211 Or App at 451. I agree with the majority that *Corp. of Presiding Bishop* is "instructive," but not dispositive. *See* 211 Or App at 453. As the majority notes, *Corp. of Presiding Bishop* did not involve a *final and outright denial*, whereas here, the county's denial of the special use permit for a religious school is a *final and outright denial*. I respectfully disagree with the majority's application of *Corp. of Presiding Bishop* to the facts here.

As noted, the county approved Timberline Baptist Church's requested special use of its property for a church and an associated day care facility. However, because Timberline Baptist Church's proposed religious school did not meet the special use criterion established in Washington County Development Code (CDC), § 430-121.3, it denied Timberline Baptist Church's requested special use of the property for a religious school to be attended solely by Timberline Baptist Church's members' children.[2] The county argued, and then LUBA agreed, that it was incumbent on Timberline Baptist Church to purchase property on which its desired use would be permitted outright and that the cost of selling its existing property in order to now do so was not a substantial burden.

I agree with the majority that the county's argument and LUBA's agreement with that argument were not correct. Timberline Baptist Church was not required to purchase property that permitted outright the building of a church, day care facility, and religious school. *See* 211 Or App at 450.[3] As the majority states, the dispositive question becomes

_____

[2] Timberline Baptist Church's permit application stated that the religious school was "closed," that is, only children of members would be allowed to attend the religious school.

[3] The concurrence notes that Timberline Baptist Church knew or could have known what land use ordinances applied to the property before it purchased the property. 211 Or App at 467 (Breithaupt, J. pro tempore, concurring). I agree on this point. Likewise, Timberline Baptist Church knew or should have known that the provisions of RLUIPA also applied to this property at the time of purchase.

whether implementation of CDC § 430-121.3 in relation to Timberline Baptist Church's property imposes a substantial burden on Timberline Baptist Church's religious exercise for the purpose of RLUIPA, that is, whether the development code forces Timberline Baptist Church to choose between adhering to a religious practice and obtaining a desired government benefit. As does the majority, I understand the relevant religious practice to be the operation of a religious school to be attended by Timberline Baptist Church's members' children, the vast majority of whom reside within the UGB, and that the religious school be located on the same property as Timberline Baptist Church's church; and the relevant benefit is approval of the special use permit for the religious school. In my view, one the majority does not share, the relevant benefit also includes the county's approval of the church and day care facility.

Particularly after the county approved the special use permit for a church and day care facility, the implementation of CDC § 430-121.3 imposes a substantial burden on the identified religious practice. That is, because, in order to obtain approval of the religious school, by meeting the criterion that the school be scaled for rural use, Timberline Baptist Church will be required to forgo or modify its practice of operating the religious school solely for the children of its members. Alternatively, if Timberline Baptist Church operated the religious school at some other location, it would have been forced to forgo its religious practice of operating its religious school in physical conjunction with its church building. The Supreme Court held that, for purposes of RLUIPA, a land use regulation imposes a substantial burden on religious exercise "if it 'pressures' or 'forces' a choice between following religious precepts and forfeiting certain benefits, on the one hand, and abandoning one or more of those precepts in order to obtain the benefits, on the other." 338 Or at 466. Implementation of CDC § 430-121.3 pressures or forces Timberline Baptist Church to make such a choice here.

To restate my position, the court in *Corp. of Presiding Bishop* stated that a land use regulation imposes a substantial burden on religious exercise "only if it 'pressures' or 'forces' a choice between following religious precepts and forfeiting certain benefits, on the one hand, and abandoning

one or more of those precepts in order to obtain the benefits, on the other." 338 Or at 466. The land use regulation here is CDC § 430-121.3. Timberline Baptist Church's religious precept is the operation of a religious school on the same property as its church. The benefit is the county's approval of the special use permit for the church and day care facility. Timberline Baptist Church is being "pressured" or "forced" to give up the approved church and day care facility on the property it owns, or to "abandon" its religious precept of operating a church and religious school on the same property and keep the approval of building a church on its property. Under the Supreme Court's interpretation of RLUIPA in *Corp. of Presiding Bishop*, CDC § 430-121.3 imposes a substantial burden on Timberline Baptist Church.

The "adverse consequences" to Timberline Baptist Church of not receiving a special use approval for not complying with CDC § 430-121.3 are in sharp contrast to the consequences at issue in *Corp. of Presiding Bishop*. There, the court expressly determined that none of the adverse consequences of the city's denial of the building permit application related to any of the church's religious practices. The consequences, therefore, did not cause the church to forgo or modify any such practice. 338 Or at 467. Rather, the adverse consequences concerned the need to comply with conditions relating to the design of the proposed facility, the need to submit a further application incorporating such conditions, and the necessity of incurring the expense and delay associated with taking those actions. The Supreme Court indicated that those types of requirements do not, in and of themselves, constitute substantial burdens but are, instead, typical costs—in both time and money—of obtaining land use approvals. Moreover, the cases deemed instructive by the Supreme Court also involved primarily those types of burdens. *See Westchester Day*, 386 F3d at 188 (substantial burden not likely where the governing body denied "only the application submitted, leaving open the possibility that a modification of the proposal * * * would result in approval"; reversing grant of summary judgment); *San Jose Christian College*, 360 F3d at 1035 (governing body's request that religious entity provide additional required information with its application did not impose a substantial burden); *see also Civil Lib. for*

*Urban Believers v. City of Chicago*, 342 F3d 752, 761 (7th Cir 2003), *cert den*, 541 US 1096 (2004) (expenditure of even "considerable" time and money to engage in permit approval process was not a substantial burden).

Here, in order to meet the criterion in CDC § 430-121.3 and still adhere to its religious practice of having its church and religious school at the same location, Timberline Baptist Church apparently will be required to arrange for most of its members to move outside the UGB. Alternatively, it must sell its current property and purchase other property. Those consequences are different in both nature and extent from those present in *Corp. of Presiding Bishop*.

The consequences of the denial relate directly to Timberline Baptist Church's adherence to its religious prac- tice of operating a religious school for the benefit of its members' children in the same location as the church. The denial imposes a "significantly great restriction or onus" on Timberline Baptist Church's religious exercise of operating a combined church and religious school on the subject property. *See Guru Nanak Sikh Soc. v. Sutter County*, 456 F3d 978, 988 (9th Cir 2006) (a land use regulation imposes a substantial burden on religious exercise when it is "oppressive to a sig- nificantly great extent" and imposes a "significantly great restriction or onus upon such exercise" (citing and quoting *San Jose Christian College*, 360 F3d at 1034 (internal quota- tion marks omitted))); *Midrash Sephardi, Inc.*, 366 F3d at 1227 (determining that a "substantial burden" on religious exercise is "more than an inconvenience" and is "akin to sig- nificant pressure which directly coerces the religious adher- ent to conform his or her behavior accordingly," that is, pres- sure to forgo religious precepts or pressure that mandates religious conduct).

In determining that the burden at issue here is not substantial, the majority relies on Free Exercise Clause cases that draw a distinction between regulations that directly compel an individual to violate his or her religious beliefs, or noncompliance with which may subject an individual to crim- inal sanctions or to the loss of a significant government ben- efit, on the one hand, *see, e.g., Sherbert; Wisconsin v. Yoder,*

406 US 205, 92 S Ct 1526, 32 L Ed 2d 15 (1972); and regulations that merely make the practice of religion more difficult or expensive, on the other, *see, e.g., Lakewood, Ohio Cong. of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio,* 699 F2d 303, 306-07 (6th Cir 1983). *See also Episcopal Student Foundation v. City of Ann Arbor,* 341 F Supp 2d 691, 701-02 (ED Mich 2004) (drawing that distinction for purposes of interpreting and applying RLUIPA). From those cases, the majority concludes that imposition of a land use regulation ordinarily cannot be deemed to impose a substantial burden on religious exercise when the impact is essentially economic. 211 Or App at 453-55.[4] For several reasons, I believe that those cases are either inapposite or distinguishable.

First, although *Sherbert* and *Yoder* involved regulations that subjected a religious adherent to, respectively, loss of a government benefit (unemployment compensation) and criminal sanctions (for failure to send children under age 16 to school), neither case holds that economic burdens—regulations that "merely" make the practice of religion more expensive—always are insufficient to implicate the Free Exercise Clause.

Second, the majority's reliance on *Lakewood,* a Free Exercise Clause case, and *Episcopal Student Foundation,* which, in turn, rely on *Braunfeld v. Brown,* 366 US 599, 81 S Ct 1144, 6 L Ed 2d 563 (1961) (plurality opinion), is misplaced. In *Braunfeld,* a state statute criminalized the retail sale of certain commodities on Sunday. 366 US at 600. Several Orthodox Jews who operated retail stores challenged enforcement of the statute, alleging that their religion required them to close their businesses on Saturday and that the statutorily required Sunday closing forced them to choose between giving up their observance of the Sabbath or suffering a "serious economic disadvantage" by being closed on both days. *Id.* at 601. The Court rejected the challenge. It explained that the statute

---

[4] In one sense, I agree with the majority that "the consequences of the implementation of the regulation are merely *economic.*" *See* 211 Or App at 463 (emphasis in original). But *all* decisions concerning the development of real property, at some level, are economic. If there were unlimited financial resources available to Timberline Baptist Church, there would not be this dispute.

"does not make unlawful any religious practices of appellants; the Sunday law simply regulates a secular activity and, as applied to [the religious adherents], operates so as to make the practice of their religious beliefs more expensive. Furthermore, the law's effect does not inconvenience all members of the Orthodox Jewish faith but only those who believe it necessary to work on Sunday. And even these are not faced with as serious a choice as forsaking their religious practices or subjecting themselves to criminal prosecution. Fully recognizing that the alternatives open to appellants and others similarly situated—retaining their present occupations and incurring economic disadvantage or engaging in some other commercial activity which does not call for either Saturday or Sunday labor—may well result in some financial sacrifice in order to observe their religious beliefs, still the option is wholly different than when the legislation attempts to make a religious practice itself unlawful.

"To strike down, without the most critical scrutiny, legislation which imposes only an indirect burden on the exercise of religion, *i.e.*, legislation which does not make unlawful the religious practice itself, would radically restrict the operating latitude of the legislature. * * *

"* * * Consequently, it cannot be expected, much less required, that legislators enact no law regulating conduct that may in some way result in an economic disadvantage to some religious sects and not to others because of the special practices of the various religions. We do not believe that such an effect is an absolute test for determining whether the legislation violates the freedom of religion protected by the First Amendment.

"Of course, to hold unassailable all legislation regulating conduct which imposes solely an indirect burden on the observance of religion would be a gross oversimplification. If the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect. But if the State regulates conduct by enacting a general law within its power, the purpose and effect of which is to advance the State's secular goals, the statute is valid despite its indirect burden on religious observance unless the State may accomplish its purpose by means which do not impose such a burden."

366 US at 605-07 (footnote omitted).

*Braunfeld,* which was decided almost 40 years prior to the adoption of RLUIPA, does not compel the result here. The statute at issue "simply regulate[d]" the religious adherents' conduct of a "secular activity." 366 US at 605. By comparison, the regulation at issue here prevents Timberline Baptist Church from conducting the religious activity itself—operation of a religious school—in the desired manner. Concomitantly, the economic burden on the adherents in *Braunfeld* resulted from the impairment of their secular, nonreligious activities. *Id.* at 606. The statute in *Braunfeld* affected only those Orthodox Jews who operated retail businesses. The statute did not affect Orthodox Judaism as a whole. *Id.* at 605. By contrast, here, the entire congregation arguably is affected by the inability of Timberline Baptist Church to operate a religious school for the benefit of members' children. In short, the effect of the statute in *Braunfeld* was more "indirect," 366 US at 606, than the direct effect of the ordinance at issue here.[5] "If the purpose *or effect* of a law is to impede the observance of one or all religions * * *, that law is constitutionally invalid even though the burden may be characterized as being *only indirect.*" (Emphasis added.) *Braunfeld,* 366 US at 607. *See also Sherbert,* 374 US at 404.

The majority also quotes at length from the federal district court's opinion in *Christian Methodist Episcopal Church v. Montgomery,* CV22322, 2007 WL 172496 (DSC Jan 18, 2007). *See* 211 Or App at 455-56. In that case, the town conditionally permitted churches in certain zones and required landowners to obtain the necessary permission. After tenants of a building began holding worship services in the building, the town notified the landowners of the need to comply with town ordinances. The owners took no action. Eventually, the tenants brought a 42 USC section 1983 claim against the town, asserting, among other claims, a violation of RLUIPA and seeking money damages. The district court granted summary judgment to the town on three alternative

---

[5] In addition, the result in *Braunfeld* was due at least in part to the significant state interest in "provid[ing] a weekly respite from all labor." *See id.* at 607-09 (discussing purpose of Sunday closing law); *see also Sherbert,* 374 US at 408 (explaining that the statute at issue in *Braunfeld* was "saved by * * * a strong state interest in providing one uniform day of rest for all workers").

bases: first, that RLUIPA is a remedial statute and that a section 1983 claim for money damages does not lie under RLUIPA; second, that, even if the tenants had properly pleaded RLUIPA as an independent cause of action, the case was not ripe because the landowners had not applied for any permits; and third, that, in any event, the tenants had not demonstrated a substantial burden on their religious exercise.

In the latter context, the district court relied in part on *Civil Liberties for Urban Believers* for the proposition that no substantial burden is present where zoning regulations present only "ordinary difficulties" attendant on any permitting process. The district court also relied extensively on the Fourth Circuit's unpublished opinion in a 1991 Free Exercise Clause case, *Christ College v. Fairfax County*, 944 F2d 901 (4th Cir 1991), *cert den*, 502 US 1094 (1992). In the latter case, the Fourth Circuit had concluded that, where several of the relevant county's zones permitted the requested use outright and the zone in which the religious entity wished to locate its facility permitted the use with a "special exception"; where the religious entity had not shown either why its members could exercise their religious beliefs only in the desired zone or how the need to comply with the "special exception" requirements and with applicable fire and safety regulations would impair their religious practice; and where the religious entity had failed to show any "nexus" between the challenged regulation and the impairment of its members' religious practice, the religious entity had failed to demonstrate a substantial burden. Applying those same tests, the district court in *Christian Methodist Episcopal Church* concluded that the religious entity in that case could not prove that the relevant regulations substantially burdened its members' religious exercise, because the landowners had never applied for the desired use.

The procedural and factual differences between *Christian Methodist Episcopal Church* and this case make the former distinguishable and not persuasive. That is because, as previously explained, I believe that the burden on petitioner in this case amounts to more than the "ordinary difficulties" of the land use permitting process and that petitioner has both justified the desire to locate its religious

school on its church property and demonstrated that compliance with the 75 percent rule will impair that religious practice—that is, petitioner has shown a "nexus" between the regulation and that impairment. No such nexus was established in *Christian Methodist Episcopal Church*.

Nor does *Corp. of Presiding Bishop* suggest that the fact that a burden can be an economic consequence means that it cannot be a substantial burden, as a matter of law. Again, that case, as well as two of the cases relied on by the Oregon Supreme Court in that case—*Westchester Day* and *San Jose Christian College*—turned on quite different burdens from those at issue here: the requirement that the applicants, at some expense, submit additional applications that met the substantive or procedural conditions or requirements implicated in the governmental entity's denial of the existing applications, such as the modification of building plans or the submission of additional information.[6]

Another group of cases that suggest that economic consequences—particularly, market forces affecting the price of property—do not constitute a substantial burden under RLUIPA are distinguishable for a different reason: they involve facial challenges to exclusionary zoning ordinances, in which the applied-for uses were prohibited, not conditionally permitted, ones. *See, e.g., Civil Lib. for Urban Believers*, 342 F3d 752; *Petra Presbyterian Church v. Village of Northbrook*, 409 F Supp 2d 1001, 1007 (ND Ill 2006). RLUIPA may indeed fail to protect a religious institution from the "harsh" economic reality that land in zones in which religious practice is permitted outright is relatively more expensive. However, those cases do not stand for the proposition that economic hardships *never* constitute a substantial burden. Nor do they apply with equal force in a case where an applicant received approval of a permitted use for a church and failed to meet one condition out of several for an associated religious school.[7]

---

[6] *See also Konikov v. Orange County, Fla.*, 410 F3d 1317, 1323-24 (11th Cir 2005) (requiring submission of applications does not itself offend RLUIPA; where zoning ordinance at issue required application for "special exception" but did not prohibit engaging in religious activity, ordinance did not impose substantial burden).

[7] It is worth noting that, in *Civil Lib. for Urban Believers*, the Seventh Circuit based its determination that RLUIPA does not protect religious adherents from the

The majority acknowledges that, although there is no bright-line test as to what showing an applicant must make in that regard, such a showing "must, at the least, demonstrate that a land use decision has forced the applicant to forgo its religious precepts." 211 Or App at 459. *Corp. of Presiding Bishop* does not address any requirement relating to the availability of *alternative* property. Neither case presented any facts or analysis relating to such availability.[8] In my view, Timberline Baptist Church in this case presented sufficient evidence of the substantial burdens, economic and otherwise, that such a requirement would impose.

The fact that the ordinance at issue here is facially neutral and uniformly applicable to all applicants does not mean that the ordinance cannot impose a substantial burden. First, by its terms, the "substantial burden" provision of RLUIPA expressly prohibits specified effects; it does not exempt facially neutral regulations from that prohibition. *See Sts. Constantine, Helen Greek Orth. v. New Berlin*, 396 F3d 895, 900 (7th Cir 2005) (where RLUIPA includes both a "substantial burden" provision and an "equal treatment" provision, the substantial burden provision must mean something other than a mere requirement to treat a religious entity on equal terms with other land use applicants). Second, as the Oregon Supreme Court explained in *Corp. of Presiding Bishop*, RLUIPA was enacted by Congress in response to the United States Supreme Court's decision in *Employment Div., Ore. Dept. of Human Res. v. Smith*, 494 US 872, 110 S Ct 1595, 108 L Ed 2d 876 (1990)—in which the Court had held that government enforcement of valid and neutral laws of general applicability that incidentally restrict religious exercise do not violate the Free Exercise Clause

---

"harsh reality of the marketplace" in part on *Braunfeld*. *Civil Lib. for Urban Believers*, 342 F3d at 761-62. As discussed above, that result in *Braunfeld* is more properly attributable to the significantly indirect nature of the economic burden imposed on the religious adherents in that case, as well as to what the court identified as the strong governmental interest in the relevant regulation.

    [8] In *Corp. of Presiding Bishop*, the petitioner proposed to construct its meeting-house on 3.85 acres of its 5.64-acre parcel. 338 Or at 456. The Supreme Court noted that submission of a new application would entail the church's "use of a greater portion of an available lot" and noted that the church had "indicated that it would be possible to acquire more land" for required buffer space. *Id.* at 467. Neither of those references implicate a requirement that a church sell its existing property and purchase, or demonstrate the infeasibility of purchasing, *alternative* property.

even if they burden religious exercise—specifically to embody, and thus restore, the "heightened scrutiny" test set out in *Sherbert*. *See also Yoder*, 406 US at 220 ("A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." (citing *Sherbert*)). Thus, both the express terms of the statute and its legislative history indicate that neither the facial neutrality of a land use regulation, nor its ostensibly uniform application to both secular and religious applicants, is dispositive of the lawfulness under RLUIPA of the governmental implementation of the regulation.

To be perfectly clear, I believe that RLUIPA *requires* giving preference to a religious institution over a secular institution so long as Congress acted in the "space for legislative action neither compelled by the Free Exercise Clause nor prohibited by the Establishment Clause." *Cf. Cutter v. Wilkinson*, 544 US 709, 719-20, 125 S Ct 2113, 161 L Ed 2d 1020 (2005) (institutionalized-persons provision of RLUIPA is a "permissible legislative accommodation of religion" that operates in the "space for legislative action neither compelled by the Free Exercise Clause nor prohibited by the Establishment Clause").

*Burden of Providing Sufficient Evidence*

I also respectfully disagree with the majority that Timberline Baptist Church failed to meet its burden to demonstrate a substantial burden by reason of its failure to provide sufficient evidence of the unavailability of other property. The need to sell one's existing property and to locate and purchase alternative property is a burden unlike that of merely meeting design conditions or submitting additional applications relating to one's existing property. At least two federal circuit courts have recognized the significance of being required to sell existing property and purchase alternative property. In *New Berlin*, the plaintiff church acquired a 40-acre parcel in a residential zone that did not allow churches outright. At the time that the church purchased the property, it was bordered on one side by a parcel owned by a second church and on the other side by a parcel owned by a

third church that had already sought and obtained a rezoning of its property and approval of a church building. 396 F3d at 898. Approximately five years after acquiring the property, the plaintiff church sought rezoning and permission to build a church. After the city expressed concern that the plaintiff church might use the property for other uses allowed by the requested new zoning classification, the church modified its application to seek only a planned unit development overlay ordinance, which specifically allowed only a church. *Id.* The city nevertheless denied approval, suggesting that the church instead seek a conditional use permit. The church demurred out of concern that it could not begin the building process within the relevant time period allowed under that form of permit. *Id.* at 898-99.

The plaintiff church then initiated an action under RLUIPA. The district court granted summary judgment for the city, concluding that, where the church failed to show that there was no other parcel on which it could build the church, the denial did not impose a substantial burden. *Id.* at 899-900.

The Seventh Circuit reversed, determining that the burden in that case—consisting of either "search[ing] around for other parcels of land" or filing additional applications relating to the existing property—was substantial. 396 F3d at 901. As particularly pertinent here, in regard to the burden of searching for other property, the court noted that, in *Sherbert,* the fact that the plaintiff may eventually have found employment that did not require her to work on her Sabbath, did not make the denial of unemployment benefits insubstantial. *Id.* (citing *Sherbert,* 374 US at 399 n 2). The Seventh Circuit therefore reversed the grant of summary judgment in favor of the city and remanded for the parties to negotiate acceptable conditions of approval. *Id.* That court again noted the distinction between the submission of modified applications, on the one hand, and *New Berlin,* involving the location and purchase of a new parcel, on the other, in *Vision Church v. Village of Long Grove,* 468 F3d 975, 999-1000 (7th Cir 2006). The Ninth Circuit apparently also recognizes that distinction. *See Guru Nanak Sikh Soc.,* 456 F3d at 989 (noting with approval the reasoning in *New Berlin* that, in order to prove a substantial burden under RLUIPA, a

religious organization need not show that there was no other parcel of land on which it could carry out the relevant religious exercise).[9]

In summary, I would conclude that CDC § 430-121.3, as applied to Timberline Baptist Church, has the effect of forcing Timberline Baptist Church to forgo or modify its religious practice of operating a school for the benefit of its members' children at the same location as its approved church. Specifically, in order to obtain the requested school use approval, Timberline Baptist Church must either operate a school primarily for children other than the children of its members or must arrange for most of its members to move outside the urban growth boundary. Alternatively, Timberline Baptist Church must locate and purchase new property where the school use is not conditioned on the criterion imposed under CDC § 430-121.3, a significant burden in and of itself and, here, one that also will cause Timberline Baptist Church to forfeit its previously obtained church use approval.

In the circumstances presented here, I would conclude that each of those alternative adverse consequences constitutes a substantial burden within the meaning of RLUIPA.[10] Accordingly, I would reverse LUBA's contrary decision and remand for consideration of whether CDC § 430-121.3 furthers a compelling governmental interest of the

---

[9] *See also Lighthouse Community Church v. City of Southfield*, 2007 WL 30280 (Jan 3, 2007) (ED Mich) (selling current property and searching for another is not a "mere inconvenience" but is a substantial burden); *Living Water Church of God v. Charter Tp. of Meridian*, 384 F Supp 2d 1123, 1132-34 (WD Mich 2005) (substantial burden means "something more than an incidental effect on religious exercise"; finding a substantial burden where the plaintiff was "a small church with limited funds" and the denial of the requested special use would require it to search for and acquire alternative property); *Greater Bible Way Temple v. Jackson*, 268 Mich App 673, 708 NW2d 756 (2005), *rev allowed*, 474 Mich 1133, 712 NW2d 728 (2006) (where applicant submitted evidence showing that it could not afford to purchase different property, and there was no dispute that the value of the existing property and the applicant's investment in it were substantial, implementation of ordinance so as to preclude requested religious use of property imposed substantial burden under RLUIPA).

[10] I emphasize that I do not mean to suggest that implementation of a land use regulation in a manner necessitating the purchase of alternative property will always constitute imposition of a substantial burden for the purpose of RLUIPA. I conclude only that the specific circumstances at issue here constitute such a burden.

county and is the least restrictive means of doing so. 42 USC § 2000cc(a)(1)(A), (B). That disposition also would obviate the necessity to consider at this time whether, as applied to the county's denial of Timberline Baptist Church's requested school use, RLUIPA violates the Establishment Clause of the First Amendment to the United States Constitution.

I respectfully dissent.